J-A28021-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ANTHONY JONES | |
| Appellant | No. 592 EDA 2019 |

Appeal from the Judgment of Sentence Entered August 22, 2018
In the Court of Common Pleas of Delaware County
Criminal Division at No.: CP-23-CR-0006642-1980

BEFORE: PANELLA, P.J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.: **FILED APRIL 06, 2020**

Appellant Anthony Jones appeals from the August 22, 2018 judgment of sentence entered in the Court of Common Pleas of Delaware County ("trial court"), following a resentencing hearing held pursuant to *Miller v. Alabama*, 132 S. Ct. 2455 (2012) and *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016).[1] Upon review, we affirm.

In connection with the November 11, 1980 brutal killing of Emily Leo, Appellant pleaded guilty to murder generally on April 30, 1981. At the time

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] In *Miller*, the U.S. Supreme Court determined that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual' punishments." *Miller*, 132 S. Ct. at 2460. In *Montgomery*, the U.S. Supreme Court held that *Miller* was a new substantive rule that, under the United States Constitution, must be retroactive in cases on state collateral review. *Montgomery*, 136 S. Ct. at 736.

of the murder, Appellant was three weeks shy of his seventeenth birthday. Following a degree of guilt hearing, the trial court found Appellant guilty of first-degree murder and, on November 23, 1981, sentenced him to life imprisonment without the possibility of parole ("LWOP").

On March 23, 2016, years after Appellant's judgment of sentence became final, he filed a petition for collateral relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46, requesting relief under *Miller* and *Montgomery*. Appellant argued that his sentence of LWOP for first-degree murder was unconstitutional because he was under the age of eighteen at the time of Mrs. Leo's murder. Following a hearing, the PCRA court agreed and scheduled a resentencing hearing on the first-degree murder conviction.

On June 13, 2018, the Commonwealth filed a notice of intent to seek imposition of a life sentence pursuant to *Commonwealth v. Batts*, 163 A.3d 410 (Pa. 2017) and 18 Pa.C.S.A. § 1102.1. The trial court conducted a resentencing hearing over the course of three days, commencing on June 19, 2018 and ending on August 22, 2018. At the hearing, Appellant presented, *inter alia*, the expert testimony of Dr. Kirk Heilbrun, who testified that he is a clinical and forensic psychologist. N.T. Hearing, 6/19/18, at 5. Dr. Heilbrun testified that it was his professional opinion that Appellant was capable of rehabilitation and re-entry into society. *Id.* at 28-29. In response, the Commonwealth did not offer any expert testimony. Finding that the Commonwealth failed to rebut the presumption against the imposition of a

LWOP sentence, the trial court resentenced Appellant to fifty years to life in prison. Specifically, the trial court stated:

> [T]he [c]ourt will acknowledge the statement made by [Appellant]. The [c]ourt, in fact, **has prepared an eight-page written Order** which I believe addresses most of the concerns raised in that matter. The [c]ourt wishes to state for the record that prior to today's decision, I reviewed the entire transcript of the original trial which runs several hundred pages, all of the [e]xpert reports that have been submitted by [Appellant] along with the sentencing memos of the parties. I've listened carefully to the testimony presented by both sides as well as the arguments of [c]ounsel. I think the best place to start the discussion is at the very beginning with the actual murder of Mrs. Leo.
>
> By all accounts, this woman was a kind and gentle woman who never harmed a soul in her life. She was the sole support of her family as her husband was wheelchair-bound with muscular dystrophy. No one is quite sure what led Mr. [Leroy] Evans and [Appellant] to choose Mrs. Leo as their victim or what twist of logic led them to commit her murder. What, however, is quite clear is what is -- that it was an extremely brutal murder. The injuries included a fractured skull, hematomas of her face, scalp, neck, chest, forearms and elbows, four fractured ribs, a fractured jawbone.
>
> Her murder started with Mr. Evans trying to strangle the poor woman with a rope. At that point, the parties -- meaning Mr. Evans and [Appellant] -- believing her to be dead attempted to dispose of her body. [Appellant] transported the woman not knowing at this point in time that she was actually alive to a deserted field. When he discovered that she was in fact still alive, he basically beat her to a pulp with a brick leading to the injuries that were outlined above.
>
> During the incarceration that followed [Appellant's] guilty plea, he amassed over 30 misconducts, the most severe of which involved a fellow prisoner that he stabbed and nearly killed in an altercation apparently over a romantic relationship with another man. He pled guilty to a charge of [a]ssault by a [p]risoner and received a life sentence running concurrent with the original sentence which was life without the possibility of parole. There was a conflict in the [e]xpert reports about Dr. [Heilbrun] and [Appellant] about what risk [Appellant] []posed to violently reoffend. [Appellant's]

[e]xpert opined that it was a medium risk to reoffend while -- whereas the Commonwealth felt that it was a high risk to reoffend. The [c]ourt has taken all this information into consideration. The [c]ourt believes that the Commonwealth has failed to establish beyond a reasonable doubt that [Appellant] was not capable of rehabilitation.

During [Appellant's] incarceration, particularly since 2012, the frequency and severity of his misconducts have declined evidencing his developing awareness of consequences and diminished impulsivity. [Appellant's] turbulent family life, lack of positive adult supervision during his developing years, poor education and borderline intellectual capacity have led to the conclusion that he was cognitively immature on -- at the time of the murder of Mrs. Leo.

Nevertheless, the fact that he fully participated in the planning and execution of robbery that led to her killing and then inflicted the -- inflicted the horrendous injuries that ended her life, his attempts to dispose of her body cannot be overlooked. In the same vain, the acts that led to his 1992 conviction for [a]ssault by a [l]ife [p]risoner and the sentence of life that was imposed as a result may not be ignored as they demonstrate that more than 10 years later after the crime while incarcerated, he used a shears to inflict near fatal injuries when engaged in an altercation with another inmate.

The Commonwealth has not met the burden of proving that [Appellant] would be [in]capable of rehabilitation. Having considered all the foregoing, the [c]ourt imposes a sentence of 50 years to life. The [c]ourt believes that this is consistent with the principles set forth in **Miller** and **Batts**, Section 1102 of the Crimes Code. The [c]ourt has considered the nature of the crime, the necessity of protection of the public, the gravity of the original offense. And for this reason, the sentence has been imposed as just stated.

N.T. Resentencing, 8/22/18, at 5-8 (emphasis added) (sic). On the same day, following the resentencing hearing, the trial court, as it had indicated on the record, filed a detailed order outlining its reasons for the new sentence of fifty years to life in prison. The court explained:

5) In determining sentence the [c]ourt has considered the factors set forth in **Miller**, **supra**, Section 1102.1, Sentence of persons under the age of 18 for murders murder of an unborn child and murder of a law enforcement officer, and the principles generally applicable in imposing sentence. **See** 42 Pa.C.S.A. § 9721 ("the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant").

6) The nature and circumstances of the offense committed by the defendant. Under the pretext of engaging in a purchase, on November 11, 1980 the [Appellant] and Leroy Evans lured [Mrs.] Leo, an "Avon Lady" to [Appellant's] family's apartment. In fact [Appellant] and Evans intended to rob her. In the course of the robbery Mrs. Leo was beaten until she lost consciousness. [Appellant] believed that Mrs. Leo was dead and in an effort to dispose of her body he put her in a trashcan and dragged the trashcan to a lot not far from the apartment. At the lot Mrs. Leo showed signs of life and [Appellant] attacked her further by throwing bricks at her head. A witness saw [Appellant] throwing bricks towards the ground and soon realized that he was assaulting a living being. The witness reported his observations and soon police arrived at the scene. [Appellant] took flight. After a chase and a standoff [Appellant] was taken into custody at his apartment.

7) Mrs. Leo was attended to by EMT personnel. When they arrived she was severely bruised, bloody and had fallen into a coma. A piece of rope was tied around her neck. She was resuscitated and taken to the hospital where she ultimately died of her injuries. A medical examiner testified regarding the victim's extensive injuries. She suffered severe and numerous blunt force injuries including cuts and bruises to her head, face, chest, forearms and elbows. There were indications that these injuries may have been sustained as she attempted to fend off her attackers. There was extensive bruising to her scalp, her face and her brain. Her skull was fractured. There was subdural and subarachnoid bleeding into her skull. Her neck and thyroid cartilage were severely bruised. She suffered four fractured ribs, a fractured sternum, a fractured skull, extreme cerebral contusions, a fractured jawbone and injuries to her neck & Adam's apple from strangulation. Mrs. Leo was forty-eight years old.

8) [Appellant] pled guilty to murder generally and in exchange the Commonwealth agreed to forego its pursuit of a death sentence. [Appellant] agreed to testify against his coconspirator at Evans's trial.

9) <u>Degree of culpability</u>. Leroy Evans was seven years older than [Appellant]. Together they committed robberies on prior occasions with [Appellant] acting as a "lookout." On this occasion however, the two men planned the robbery together, lured Mrs. Leo, and together brutally assaulted her. Evans left the [Appellant's] home after beating Mrs. Leo. [Appellant] attempted to remove "the body." When he saw that she was still alive he ensured her eventual death by using bricks to inflict fatal damage to her head. [Appellant] acted with Evans and then went further, acting alone to ensure that she was dead and to dispose of her body.

10) <u>The impact of the offense on the victim, her family and the community</u>. John Kaisner, a retired City of Chester police officer and a nephew-in-law to Mrs. Leo testified at [Appellant's] resentencing hearing on June 20, 2018. Mr. Kaisner was called to the hospital back in 1980 to identify Mrs. Leo. He testified that he had never in his career seen a person so badly beaten about the head.

11) Mr. Kaisner describes Mrs. Leo as a petite, kind, friendly and gentle woman. She was the sole provider and caretaker for her husband who suffered from muscular dystrophy and was wheelchair bound. She had one son, a gifted guitar player. After his mother's death he never played his guitar again. Her son had no apparent alcohol abuse issues before his mother's death but eventually he died of alcohol poisoning. In Mr. Kaisner's words, he "drank himself to death." His father, Frank Leo, Sr., died several years after his wife's murder. The impact of Mrs. Leo's death on her remaining family members was devastating: "It killed that family."

12) Mrs. Leo's home was in the McCaffrey housing project in the City of Chester and she was a well-respected member of that community. The community came together and said their "good byes" to support the family at the time of this "horrible" killing.

13) <u>Age</u>. [Appellant] was sixteen years old when he and Leroy Evans robbed and murdered Mrs. Leo.

14) <u>Family history</u>. Through the testimony from Dr. Kirk Heilburn, a well-qualified clinical & forensic psychologist and Julie Smythe, a mitigation specialist and licensed social worker, the defense offered a description of [Appellant's] psychologically, emotionally and economically impoverished childhood. He was born to a seventeen year-old mother and was the oldest of her children. She went on to have a total of seven children with five different fathers. His mother worked several jobs but struggled to provide for her family. The family income was about $500 a month. [Appellant's] father was not a part of his life. During his upbringing he witnessed physical abuse suffered by his mother at the hands of her paramours. [Appellant's] sister, Monica Jones testified that she too watched as her mother was beaten by men. On one occasion her mother jumped out of a second-story window and broke her leg in an effort to escape an abuser. At the age of ten, after this incident, Monica Jones permanently left the home and lived with a relative.

15) As the oldest child [Appellant] took on a self-imposed role as his mother's protector and his siblings' provider. He intervened when his mother was beaten and he stole money and shoplifted to provide foods for the children.

16) [Appellant's] family lived in two different housing projects in the City of Chester where they were subject to animus and hostility due to their race. Their apartment was firebombed and they were forced to relocate to a mainly white project where family members were verbally and physically assaulted.

17) [Appellant] struggled in school. Beginning in sixth grade, a grade that he repeated, he received failing grades. He received special education. Eventually in tenth grade he dropped out of school. Later he earned a GED while he was incarcerated:

18) <u>Juvenile history</u>. [Appellant] was arrested three times as a juvenile. He reported that he was involved in other criminal activity which went undiscovered including robberies with [] Evans.

19) He was in juvenile placement for six months between October 1979 and April 1980. It was the opinion of staff at the Sleighton Farms residential program that [Appellant] was not prepared to be released after six months but nevertheless he was returned to his mother's care and placed on probation at that time.

20) <u>Maturity</u>. Dr. Heilbrun testified that the field[s] of psychology and psychiatry recognize that at the age of sixteen adolescent psychosocial immaturity affects judgement, emotions and decision-making. Immaturity in this sphere makes adolescents more likely to discount risks. They are less likely to recognize the consequences of their behavior. They are more likely to be susceptible to peer influences and a traumatic family life, poor education and low level of intellectual functioning will affect psychosocial maturity. The [c]ourt accepts Dr. Heilbrun's testimony and in light of these factors finds that [Appellant's] cognitive maturity was not fully developed at the age of sixteen.

21) <u>Mental Capacity</u>. Dr. Heilbrun administered various psychological and intelligence tests. [Appellant] "functions intellectually in the Borderline range." He has a full scale IQ of 71. He reads at a fourth grade level, spells at a third grade level and performs at a fourth or fifth grade level in [m]ath. His reading comprehension is at a fifth grade level. His verbal skills tested slightly higher but in Dr. Heilbrun's opinion he is "still borderline." The MMPI-2 which measures "current psychological and personality function" was administered. [Appellant's] clinical score on the paranoia and psychopathic deviate subscores was high. Individuals with this profile are generally predisposed to psychological and interpersonal problems.

22) <u>Incarceration</u>. [Appellant's] has been imprisoned for thirty-eight years and over that time he has accumulated over thirty misconducts. Some these "misconducts" were relatively minor but many involved aggressive assaults and behaviors. Three of the aforesaid misconducts have occurred in the past ten years. [Appellant] has attributed many of his misconducts to the fact that fellow inmates knew that he was a Commonwealth witness and threatened him for that reason.

23) [Appellant] testified against Leroy Evans in 1981 and he has been subject to threats from other inmates associated with his role as a Commonwealth witness. In 1982 while housed at SCI Graterford he received severe threats. He committed arson in his own cell in an effort to be removed from the general population when his requests for a transfer were denied. A 2012 misconduct arose after ***Miller*** was decided and [Appellant] was threatened by a fellow inmate for failing to offer testimony on behalf of Leroy Evans.

24) In 1992 when [Appellant] was about 29 years old and housed at SCI Graterford he stabbed a fellow inmate. [Appellant] entered a negotiated guilty plea to [a]ssault by a [l]ife [p]risoner (18 Pa.C.S.A. § 2704) on December 1, 1994 and a [l]ife sentence was imposed to be served concurrently with the sentence imposed in this case.

25) Investigative reports state that [Appellant] and the victim worked in the Institution Clothing Plant. An employee supervisor came upon [Appellant] and Willie Baker and Baker in the midst of a fight where [Appellant] was thrusting his assigned shears into Baker's upper body. Inmates, the supervisor and eventually correctional officers struggled with [Appellant] trying to get the shears and pull him off of Baker but to no avail. He was eventually pulled to the floor and the shears were removed from his hands. [Appellant] stabbed Baker in the chest, shoulder and stomach. DOC reports suggest that the stabbing occurred during a dispute concerning a romantic relationship with a third man.

26) Since 2012 [Appellant] has participated in positive prison programs. His job performance/attitude and relationships/personal characteristics overall rating is "average."

27) Current family support. Family members, particular [Appellant's] sisters have demonstrated their support for him during his incarceration. A home with a sister living in in New Castle, Delaware is available to him should he be granted parole.

28) Risk of Re-offending. Testing and analysis conducted by Dr. Heilbrun led him to conclude that [Appellant] is at "medium" risk of re-offending based on results of the Level Service /Case Management Inventory. He has matured in prison. He is no longer cognitively immature and therefore would not be subject to the impulsivity and cognitive immaturity the, at the age of sixteen, would have made him unable to recognize and appreciate the consequences of his behavior. However, DOC reports indicate [Appellant] falls in the Offender Violence Risk Typology (OVRT) "Category 3 indicating a high likelihood of re-offending violently."

29) Substance Abuse. [Appellant] has no significant history of substance abuse although he was subject to five disciplinary proceedings for possession of controlled substances, fermented beverages and drug paraphernalia in the 1980s.

30) <u>Defendant's remorse</u>. During his re-sentencing hearing [Appellant] expressed his remorse for taking part in what he described as Mrs. Leo's "brutal killing." He acknowledged the pain that he has caused the Leo family and stated that he accepts "full responsibility" for the part he played in her death. He acknowledged mistakes he has made inside of prison and pledged to do better if given the opportunity.

31) Subsequent to his co-defendant's trial [Appellant] recanted his testimony on several occasions. Most recently, on July 29, 2016 [Appellant] gave a sworn statement to Leroy Evans's current attorney. At the time he gave the statement [Appellant] was represented by the Delaware County Office of the Public Defender which had filed the instant petition seeking resentencing. However, without notifying the Defender's Office Evans's attorney took the sworn statement without counsel for [Appellant] present. [Appellant] was not advised of his Fifth Amendment rights, although Evans's attorney did tell him that he could have an attorney present if he wanted one. Following each recantation, including this latest, [Appellant] indicated that these recantations were made under duress and that he had been threatened by friends and family of Mr. Evans.

Trial Court Order, 8/22/18, at ¶¶ 5-31 (record citations omitted).

On August 24, 2018, Appellant filed post-sentence motions, challenging his new sentence of fifty years to life in prison. Following a hearing, the trial court denied the motion. Appellant timely appealed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant presents two issues for our review.

I. Whether the lower court imposed an illegal sentence of 50 years to life confinement for an offense [Appellant] committed when he was 16 years old - because the commonwealth sought the re-imposition of life confinement without the possibility of parole and the lower court failed to consider, on the record prior to sentencing, the attendant characteristics of youth that mitigate against the most severe punishment for juvenile offenders, in violation of **Commonwealth v. Machicote**, 206 A.3d 1110 (Pa. 2019).

II Whether the lower court imposed an illegal sentence of 50 years to life confinement for an offense [Appellant] committed when he was 16 years old - where such sentence amounts to a *de facto* life sentence without the possibility of parole and the commonwealth failed to prove beyond a reasonable doubt that [Appellant] is permanently incorrigible, irreparably corrupt or irretrievably depraved[.]

Appellant's Brief at 5.

Appellant first argues that, because the Commonwealth sought a LWOP sentence, the trial court erred in failing to consider on the record the factors outlined in **Miller** and Section 1102.1, as required by **Machicote**.

A claim that a sentencing court failed to comply with the requirements in **Miller** is a challenge to the legality of the sentence. **Machicote**, 206 A.3d at 1119. When reviewing the legality of a sentence, our standard of review is *de novo* and our scope of review is plenary. **Commonwealth v. Seskey**, 170 A.3d 1105, 1107 (Pa. Super. 2017). A sentence must be vacated if it is found to be illegal. **Commonwealth v. Rivera**, 95 A.3d 913, 915 (Pa. Super. 2014).

In **Commonwealth v. Knox**, 50 A.3d 372 (Pa. 2012), we explained:

[A]lthough **Miller** did not delineate specifically what factors a sentencing court must consider, at a minimum it should consider a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation.

- 11 -

***Knox***, 50 A.3d at 745.

Section 1102.1 provides in pertinent part:

In determining whether to impose a sentence of life without parole under subsection (a), the court shall consider and make findings on the record regarding the following:

(1) The impact of the offense on each victim, including oral and written victim impact statements made or submitted by family members of the victim detailing the physical, psychological and economic effects of the crime on the victim and the victim's family. A victim impact statement may include comment on the sentence of the defendant.

(2) The impact of the offense on the community.

(3) The threat to the safety of the public or any individual posed by the defendant.

(4) The nature and circumstances of the offense committed by the defendant.

(5) The degree of the defendant's culpability.

(6) Guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing.

(7) Age-related characteristics of the defendant, including:

(i) Age.

(ii) Mental capacity.

(iii) Maturity.

(iv) The degree of criminal sophistication exhibited by the defendant.

(v) The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.

(vi) Probation or institutional reports.

(vii) Other relevant factors.

18 Pa.C.S.A. § 1102.1(d).

Preliminarily, we note that our Supreme Court decided **Machicote** on April 26, 2019, **after** Appellant was resentenced on August 22, 2018. The trial court, therefore, did not have the benefit of **Machicote**.

> In [**Machicote**] our Supreme Court revisited the circumstances in which a sentencing court must consider the **Miller** factors when resentencing a juvenile offender. In that case, the appellant was originally convicted of second-degree murder in 2004 for a crime committed when he was 17 and received a life-without-parole sentence as required by Section 1102 of the Crimes Code. At the appellant's resentencing hearing pursuant to **Miller** and **Montgomery**, the Commonwealth requested a life-without-parole sentence, but the sentencing court ultimately imposed a sentence of 30 years to life imprisonment. The court, however, did not consider the **Miller** factors as they pertained to the appellant on the record at the resentencing hearing, and the appellant argued on appeal that the failure to consider the **Miller** factors rendered his new sentence unconstitutional. The Supreme Court agreed, holding that a court that performs a resentencing pursuant to **Miller** and Montgomery of a juvenile offender exposed to a potential life-without-parole sentence must conduct an individualized sentencing with reference to the **Miller** factors, as well as the criteria listed in Section 1102.1(d), even where the sentencing court ultimately does not impose a life-without-parole sentence.

**Commonwealth v. Lekka**, 210 A.3d 343, 356 (Pa. Super. 2019) (footnote and citations omitted).

The instant case is distinguishable from **Machicote**. As detailed above, even though the trial court here did not have the benefit of the **Machicote** decision, it nonetheless considered the **Miller** and Section 1102.1(d) factors in an order referenced at the resentencing hearing and filed after the same.

Indeed, in its August 22, 2018 order, the court thoroughly analyzed Appellant's specific characteristics and circumstances, and based upon those, imposed a sentence of fifty years to life in prison. Accordingly, we conclude that the trial court complied with the procedural requirement of **Machicote**.

Appellant next argues that his sentence of fifty years to life imprisonment constitutes a *de facto* life sentence without the possibility of parole because he would not be eligible for parole until the age of sixty-six. Appellant's Brief at 39. We disagree.

We recently decided **Commonwealth v. Anderson**, ___ A.3d ___, 2020 PA Super 1, 2019 WL 6335390, at *7-8 (Pa. Super. filed November 27, 2019), a post-**Miller** case, where, as here, the defendant was resentenced to fifty years to life imprisonment. **Anderson**, 2019 WL 6335390, at *2. There, we held that a sentence of fifty years to life in prison is not the functional equivalent of LWOP. **Anderson**, 2019 WL 6335390, at *6 ("Pennsylvania does not recognize a definitive term of imprisonment as a *de facto* LWOP sentence."). Accordingly, like the defendant in **Anderson**, Appellant too does not obtain relief on his *de facto* LWOP sentence claim. **See Commonwealth v. Bebout**, 186 A.3d 462, 468 (Pa. Super. 2018) (concluding the appellant's forty-five years to life sentence in which he would be eligible for parole at the age of 60 was not *de facto* LWOP); **Lekka**, 210 A.3d at 357-58 (concluding that because the appellant's term of forty-five years to life imprisonment rendered him eligible for parole at the age of 62, it was not a *de facto* LWOP sentence); **Commonwealth v. Foust**, 180 A.3d 416, 438, 441 (Pa. Super.

2018) (concluding that the appellant's two consecutive thirty year to life sentences were not a *de facto* LWOP sentence and noting that even considering the appellant's aggregate sentence, he had a chance of being released into society in his 70s).

In sum, under the circumstances of this case where Appellant was resentenced prior to our Supreme Court's issuance of **Machicote**, we cannot conclude that the trial court failed to place on the record its reasons for Appellant's new sentence. As stated, the trial court considered the **Miller** and Section 1102.1(d) factors in an order referenced on the record at the resentencing hearing and filed after the same. We likewise cannot conclude that the trial court imposed an illegal *de facto* life sentence when it sentenced Appellant to fifty years to life. Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

Date: *4/6/2020*